UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
SPENCER JEAN,

           Petitioner,

                                     <u>MEMORANDUM AND ORDER</u>
      -against-                  19-CR-0123(JS)

UNITED STATES OF AMERICA,

           Respondent.
----------------------------------X
APPEARANCES
For Petitioner:      Spencer Jean, <u>Pro Se</u>
                  #72095-053
                  FCI RAY BROOK
                  FEDERAL CORRECTIONAL INSTITUTION
                  P.O. Box 900
                  Ray Brook, New York  12977

For Respondent :    Andrew P. Wenzel, Esq.
                  United States Attorney's Office
                  Eastern District of New York
                  610 Federal Plaza
                  Central Islip, New York  11722


SEYBERT, District Judge:

      Presently before the Court is the <u>pro se</u> Section 2255 habeas petition of Spencer Jean ("Petitioner" or "Jean"), seeking to vacate, set aside, or correct his sentence (hereafter, the "Petition").  (<u>See</u> Petition, ECF No. 178; <u>see also</u> Support Memo, ECF No. 180.[1])  The Government opposes the Petition.  (<u>See</u> Opp'n,

---

[1]  When citing the Petition and Support Memo, the Court will use the page numbers generated by the Court's Electronic Case Filing system ("ECF").

ECF No. 192.[2])  For the following reasons, the Petition is **DENIED** in its entirety.

BACKGROUND

I.    The Underlying Crimes[3]

In the spring of 2018, Petitioner, a convicted armed robber who was on federal supervised release, reconnected with a fellow convict he had met while the two were residents of a federal halfway house, to wit, Ryan Goetz ("Goetz").  Goetz, a drug dealer, had reached out to Petitioner offering to sell Petitioner marijuana (hereafter, the "Drugs").  Apparently to entice Petitioner, Goetz created a Snapchat video to show Petitioner the Drugs he (Goetz) had for sale.  Interested in acquiring the Drugs, Petitioner agreed to meet Goetz at Goetz's house; the Drug transaction was to take place on March 20, 2018.

On the morning of March 20, 2018, together with Joel Mauzoul ("Mauzoul"), Petitioner drove from Westbury, New York, to

---

[2]  When citing the Opposition, the Court will use the page numbers generated by ECF.

[3]  The Court assumes the parties' familiarity with the underlying facts of this case.  Unless otherwise noted, the facts are drawn from the Superseding Indictment (see ECF No. 50; see also ECF No. 99 (same, re-docketed)) and the Presentence Investigation Report ("PSR") (see ECF No. 116 (sealed)).  See also United States v. Jean, No. 19-CR-0123, 2020 WL 70921 (E.D.N.Y. Jan. 7, 2020) (hereafter, the "Post-Trial Order") (also found in the Case Docket at ECF No. 113), aff'd, No. 20-3659, 2022 WL 1100433, slip op. (2d Cir. Apr. 13, 2022) (summary order) (hereafter, the "Second Circuit Affirmance").

Goetz's house in Middle Island, New York.  "Jean called Goetz twice th[at] morning to inform him of his estimated time of arrival." Second Circuit Affirmance, 2022 WL 1100433, at *1.  The calls were made on Petitioner's cell phone and generated location information for the cell towers that carried the calls.

When he arrived at Goetz's house, Petitioner entered unannounced.  Indeed, Goetz exited his bathroom to find Petitioner standing in front of him.  Petitioner ordered Goetz to give him the Drugs, which were on the kitchen table.  "Goetz and [Petitioner] physically struggled over the [Drugs]" and "[i]n the ensuing altercation, [Petitioner] took out a gun, shot Goetz in the leg, and fled with the [Drugs]" (hereafter, the "Robbery"). Post-Trial Order, 2020 WL 70921, at *1.  Goetz collapsed; he suffered a shattered femur.  (See PSR ¶11.)  Thereafter, "Goetz called 911 and reported he had been shot." Post-Trial Order, 2020 WL 70921, at *1.

Prior to the Robbery, while enroute to Goetz's house, Petitioner was in communications with a former girlfriend, Natasha McPherson ("McPherson").  Petitioner "told her he was going to see 'the kid from the halfway house' about some marijuana.  She told him not to go." Post-Trial Order, 2020 WL 70921, at *2 (omitting citations to Trial Transcript).  Later that morning, Petitioner called McPherson and told her he was coming to pick her up so they could go out to eat.  See id.  "He arrived at her home in West

3

Babylon in a dark grey four-door BMW accompanied by" Mauzoul.  Id. Petitioner instructed McPherson to drive with Mauzoul and Petitioner would follow in McPherson's car.  See id.  During McPherson's and Mauzoul's car ride, (1) McPherson spoke with Petitioner via FaceTime, with Petitioner telling McPherson he had no choice but to shoot Goetz "because the guy rushed him", but (2) Mauzoul stated Petitioner did not have to shoot Goetz.  Id. (quoting Trial Tr. 439:21-440:3; 439:16-20).

Approximately 15 minutes after McPherson and Mauzoul arrived at Mauzoul's house, Petitioner also arrived, but dressed in different clothes.  Petitioner proceeded to open the rear door of the BMW, where McPherson saw white bags and smelled marijuana. She then observed Petitioner "use a white glove to remove a gun from the backseat of the car and hand it to [Mauzoul]."  Id. Thereafter, Petitioner and McPherson went to an IHOP restaurant in Freeport, New York (the "IHOP").  See id. (citing Trial Tr. 440:7-441:10).  At the IHOP, Petitioner informed McPherson of his plan to use her as his alibi.  See id.

II.  Petitioner Is Arrested and Charged

On May 30, 2018, Petitioner was arrested and charged in connection with the Robbery; at that time, he was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (hereafter, the "Earlier Action").  See United States v. Jean, No. 18-MJ-0483, ECF Nos. 1 (Compl.), 4 (Min. Entry of

4

Arraignment)).   Petitioner had previously been convicted in connection with a string of armed robberies, see generally United States v. Jean, No. 07-CR-0844 (E.D.N.Y. 2007); as a result, he was prohibited from possessing a firearm when he robbed and shot Goetz.  See Jean, No. 18-MJ-0483, Compl. ¶4.  However, on July 2, 2018, in the Earlier Action, the Government moved to dismiss the complaint without prejudice.[4]  See id., Mot. to Dismiss, ECF No. 8.  Said motion was granted the same day.  See id., Order, ECF No. 9.)

Thereafter, on March 7, 2019, a grand jury returned a two-count indictment charging Petitioner with Hobbs Act robbery and illegal use of a firearm for the Robbery; that triggered the opening of the Instant Case.  (See Instant Case, No. 19-CR-0123, Indictment, ECF No. 1.)  The two-count indictment was superseded on April 30, 2019,[5] with the Government adding: a count for possession with intent to distribute marijuana; a count for conspiracy to obstruct justice; and a count for obstruction of justice.  (See id., First Superseding Indictment, ECF No. 38.)  A

---

[4]   Presumably, the Government moved to dismiss the complaint because it had not brought an indictment within the required 30-day period.  See, e.g., 18 U.S.C. § 3161(b); (compare, e.g., Apr. 17, 2019 Status Conf. Hr'g Tr., Ex. C, ECF No. 192-3, at 6, attached to Opp'n.).

[5]   Also, on April 30, 2019, this case was reassigned to the undersigned since then-presiding District Court Judge Joseph F. Bianco had been elevated to the Second Circuit Court of Appeals. (See Apr. 30, 2019 ORDER REASSIGNING CASE.)

week later, on May 7, 2019, a subsequent superseding indictment issued; the Government added a sixth count, charging Petitioner as a felon in possession of a firearm for an earlier, November 2016 incident.  (See id., Second Superseding Indictment, ECF No. 50.) Petitioner pled not guilty to each Indictment (see Mar. 13, 2019 Min. Entry, ECF No. 7 (re: Initial Indictment); May 3, 2019 Min. Entry, ECF No. 42 (re: First Superseding Indictment); May 7, 2019 Min. Entry, ECF No. 51 (re: Second Superseding Indictment)), and did not consent to the waiver of any Speedy Trial time.  (See, e.g., May 7, 2019 Min. Entry (denying Motion to Dismiss for Speedy Trial, ECF No. 30); Jean Decl., Ex. A, ECF No. 180-1, at ¶4 ("I expressed a desire to proceed to trial as quickly as possible in my criminal case."); see also Opp'n at 8 ("Jean refused to agree to any exclusion of time under the Speedy Trial Act, even when it became clear that doing so would have afforded [Attorney Haley] additional time to review discovery and prepare for trial.").)

III. Pre-Trial Matters

    A.    The Government's Rule 16 Disclosures

Beginning in mid-March 2019, the Government made the first of several Rule 16 disclosures; it included records of Petitioner's cellphone activity between March 19 and 21, 2018, which had been acquired from T-Mobile U.S., Inc. ("T-Mobile"), in October 2018, pursuant to a Suffolk County search warrant

(hereafter, the "October 2018 Phone Records").  (See ECF No. 15.)

As the Government further explains:

> The October 2018 Phone Records reflected communications between [Petitioner] and Goetz on the morning of the [March 20, 2018] shooting and contained location information (expressed as eight-digit latitudinal and longitudinal coordinates) for the cell towers that carried the calls (hereinafter, "cellsite data").  The coordinates of two calls—at 10:50 a.m. and 11:01 a.m.—placed [Petitioner] in the vicinity of Goetz's residence at or about the time of the shooting.  [Petitioner] had previously received the October 2018 Phone Records through discovery in a parallel Suffolk County prosecution and had told . . . McPherson in a recorded telephone call that "they have my cell phone in the area."

(Opp'n at 3; see also Apr. 2, 2019 Cover Ltr., ECF No. 16 (referencing CDs provided to defense counsel, including "[a]udio recordings of telephone calls placed between March 14, 2019 and March 25, 2019, which contain statements of the defendant (JEAN_000497 – JEAN_000539)").)

One month later, the Government made another Rule 16 disclosure, which included additional cellphone activity by Petitioner covering a period between March 1 and May 9, 2018.  (See Apr. 17, 2019 Cover Ltr., ECF No. 21.)  This cellphone activity information had been produced by T-Mobile on March 29, 2019 (hereafter, the "March 2019 Phone Records"), pursuant to a federal search warrant (hereafter, the "Cell-Site Warrant").  Notwithstanding the Cell-Site Warrant requiring it to do so, and

even though the March 2019 Phone Records reflected the same communications between Petitioner and Goetz, those Records did not contain cell-site data for certain individual entries, including the March 20th 11:01 a.m. call from Petitioner to Goetz. (See Opp'n at 4.) Hence, on May 4, 2019, T-Mobile supplemented its production (hereafter, the "May 2019 Phone Records"); said production included the missing cell-site data required by the Cell-Site Warrant. Yet, regarding the communications between Petitioner and Goetz on March 20th, "the May 2019 Phone Records were identical to the October 2018 Phone Records" initially disclosed by the Government in March 2019. (Opp'n at 4.) In other words, the May 2019 Phone Records placed Petitioner in the vicinity of Goetz's residence at or around the time of the Robbery.

On May 9, 2019, the Government made another Rule 16 disclosure, which included Mauzoul's cellphone activity (hereafter, the "Mauzoul Phone Records"). (See May 9, 2019 Cover Ltr., ECF No. 55.) The Mauzoul Phone Records placed Mauzoul in the vicinity of Gotz's residence at or around the time of the Robbery.

Via a motion in limine, the Government sought the admission of all the Phone Records. (See Govt's Mot. In Limine, ECF No. 73.) Said motion was accompanied by a T-Moblie certification attesting to the authenticity of the Phone Records. (See T-Mobile Stmt., Ex. GX 26.1, attached to Mot. In Limine at

8

ECF p.5.)   In response to the motion in limine, subsequent defense counsel, Richard Haley, conceded the Phone Records were "properly authenticated for admission into evidence."[6]   (In Limine Response, ECF No. 74, at 1.)

   B.   The Notice of Alibi and Related Case Development

   After the Government's March 2019 disclosure of the October 2018 Phone Records, on April 8, 2019, Petitioner's original defense counsel, Richard Finkel, filed a Notice of Alibi, which summarily stated:   "[A]t the place and approximate time of the alleged crime charged in the indictment, the defendant was traveling between Medford Long Island, and Free port [sic] Long Island, with intended stop during said trip.".   (Notice of Alibi, ECF No. 17.)   At the direction of then-presiding Judge Bianco, Petitioner supplemented said Notice on April 18, 2029, further describing his alleged traveling at the time of the Robbery and identifying McPherson as the person he would use to support his alibi defense.   (See Alibi Notice Suppl., ECF No. 23.)   In sum, Petitioner's alibi was that, on the morning of the Robbery, after Petitioner visited McPherson at her alleged place of work, the Medford Multicare Center located in Medford, Petitioner started towards Goetz's house, only to change direction before the Robbery—

---

[6] On the first day of trial, June 24, 2019, after hearing arguments on it, the Court granted the motion in limine.   (See June 24, 2019 Min. Entry, ECF No. 85.)

supposedly because Goetz no longer had anything to sell Petitioner—and, instead, headed towards Freeport.

Prior to Petitioner's alibi notice, the Government was unaware of McPherson.  (See Haley Decl., Ex. B., ECF No. 192-2, at ¶ 19, attached to Opp'n.)  However,

> [u]pon receiving the alibi information, the Government interviewed McPherson.  She admitted that the alibi was false and that [Petitioner] had asked her to testify falsely on his behalf.  He contacted her numerous times via Google Voice because "it was secure."  [Petitioner's] brother also reached out to [McPherson] several times in an effort to get her to provide an alibi.  [McPherson] testified to the same before a Grand Jury and at this trial.

Post-Trial Order, 2020 WL 70921, at *2 (citations to Trial Tr. omitted); (see also Opp'n at 6 (stating McPherson also advised the Government that Petitioner "committed the robbery and shooting of Goetz with Mauzoul")).

Thereafter, on May 2, 2019, the Government filed a Curcio-based[7] letter motion indicating Petitioner's initial defense counsel, Attorney Finkel, would be called as a trial witness to testify about Petitioner's dependence upon a false alibi.  (See May 2, 2019 Ltr. Mot. Seeking Curcio Inquiry, ECF No. 52 (sealed).)  It sought a determination whether Attorney Finkel was conflicted under the witness-advocate rule, especially as to

---

[7]  See United States v. Curcio, 680 F.2d 881 (2d Cir. 1982).

10

new charges brought in the First Superseding Indictment charging Petitioner with conspiracy to obstruct justice and obstruction of justice. (See id.) "During a May 3, 2019 conference, [Attorney] Finkel conceded the existence of a conflict and was relieved from further representing [Petitioner]." (Opp'n at 7; see also May 3, 2019 Min. Entry, ECF No. 42 (stating, inter alia, Attorney "Finkel's oral motion to withdraw as counsel is granted").) Thereafter, Petitioner was assigned Attorney Haley to represent him. (See May 3, 2019 Min. Entry; see also CJA Appt. Form, ECF No. 43.) Attorney Haley did so through the conclusion of Petitioner's trial. (See generally Haley Decl.; see also July 18, 2019 Min. Entry, ECF No. 102 (noting appointment of Attorney Ferrante in place of Attorney Haley); CJA Appt. Form, ECF No. 103.)

C.   Expert Disclosures

While still representing Petitioner, Attorney Finkel requested, inter alia, permission to retain a cell-tower expert. (See Def.'s Ltr. Mot., ECF No 18 (sealed).) At an April 17, 2019 pre-trial status conference, then-presiding Judge Bianco granted that request. (See Apr. 17, 2019 Status Conf. Hr'g Tr. at 3.) Judge Bianco stated he would "so order" Attorney Finkel's Letter Motion. (See id.) However, that did not occur; instead, on April 29, Attorney Finkel filed a "Notice of Filing a Proposed Order" together with a proposed order authorizing Attorney Finkel "to engage the services of a certified cyber and cellular forensic

11

expert, to assist in preparing for trial" in this case. (See ECF Nos. 36 (re: Notice), and 36-1 (re: Proposed Order).) For unknown reasons, the proposed order was not signed by the Court. Further, in compliance with Judge Bianco's April 17 directives, on April 26, 2019, the Government disclosed its intention to call various experts at trial, including a cell-site data expert, to wit, David M. Magnuson ("Magnuson"). (See Govt's Potential Expert Witnesses Disclosure Ltr., ECF No. 31.)

Thereafter, on May 6, 2019, after Attorney Finkel had been replaced by Attorney Haley, Attorney Haley filed a "Notice of Retention of Expert", identifying Konstantinos Dimitrelos ("Dimitrelos") as being "retained as an expert regarding cell site tracking" on behalf of Petitioner. (See Def.'s Expert Retention Notice, ECF No. 45.) As the Government observed: Attorney "Haley neither indicated whether Dimitrelos would testify at the trail nor provided any materials relating to Dimitrelos's experience, qualifications, or anticipated opinions." (Opp'n at 7-8.)

D.    Speedy Trial, Excludable Time, and Rescheduling of Trial

At his initial arraignment on March 13, 2019, Petitioner refused to waive any Speedy Trial time. (See Finkel Decl., ECF No. 30-1, ¶18, attached to Mot. to Dismiss, ECF No. 30.) At the first, March 15, 2019 Status Conference before then-presiding Judge Biance, a May 13, 2019 jury trial was scheduled; again, Petitioner refused to waive any Speedy Trial time. (See JFB Mar.

12

15, 2019 Min. Entry, ECF No. 10; see also Finkel Decl. ¶19.)   At the next status conference, on April 17, 2019, Petitioner did not waive Speedy Trial time.   (See JFB Apr. 17, 2019 Min. Entry, ECF No. 19.)   At that conference, an expedited briefing schedule was set for Petitioner's anticipated motion to dismiss the case on the basis that the then-current indictment was essentially the same as what was charged in the complaint in the Earlier Action against Petitioner.   (See Apr. 17, 2019 Status Conf. Hr'g Tr. at 4-5; see also JFB Apr. 17, 2019 Min. Entry.)   The Speedy-Trial-related dismissal motion was filed on April 24, 2019, thereby stopping the Speedy Trial clock.   See 18 U.S.C. § 3161(h)(1)(D).

On May 3, 2019, an arraignment on the First Superseding Indictment, status conference, and Curcio hearing was held before the undersigned.   (See JS May 3, 2019 Min. Entry, ECF No. 42; see also May 3, 2019 Combined Hr'g Tr., Ex. D, ECF No. 192-4, attached to Opp'n.)   There was no discussion regarding the tolled Speedy Trial clock.   (See May 3, 2019 Combined Hr'g Tr.)   Indeed, May 13, 2019 continued to be the operative start date for Petitioner's trial, although Petitioner's new counsel, Attorney Haley, stated he could not represent to the Court that he "would be prepared and ready to proceed to trial on May 13th."   (See id. at 17:1-3.)

On May 7, 2019, the Court held a motion hearing on Petitioner's Speedy-Trial-related dismissal motion; it also arraigned Petitioner on the Second Superseding Indictment, to

13

which he pled not guilty. (See JS May 7, 2019 Min. Entry, ECF No. 51; see also May 7, 2019 Mot. Hr'g Tr., Ex. E, ECF No. 192-5, attached to Opp'n.) After hearing oral arguments on Petitioner's dismissal motion, the Court denied said motion, finding the indictments in the Instant Case charged crimes that were not charged in the complaint in the Earlier Action. (See May 7, 2019 Mot. Hr'g Tr. at 25-26.) That ruling also confirmed counsels' understanding that 28 days remained on the Speedy Trial clock. (Compare May 7, 2019 Mot. Hr'g Tr. at 2-4, with id. at 25.) Thereafter, the Court reiterated its readiness to commence the trial on May 13, 2019. (See id. at 26.) However, given Attorney Haley was newly appointed, having been appointed as defense counsel a mere four days before the May 7th hearing, the Government pressed for a continuance, arguing: "The defendant can say all he wants that he wants to go to trial but there is no right to go to trial with an attorney who is not adequately prepared." (Id. at 28:24.) It opined, to do otherwise would be "gaming the system". (Id. at 28:11; see also id. at 28:7-10.) Of significance, Attorney Haley "concur[red] as a matter of ethics, as a matter of personal, professional responsibility, that no attorney should proceed to trial in a case--in any case, certainly a criminal case--where he has not been able to adequately prepare for trial." (Id. at 28:19-24.) Because of defense counsel's need to properly prepare for trial, especially in light of the Second Superseding

14

Indictment, the voluminous discovery materials which needed to be reviewed, as well as two pending motions in limine which needed to be addressed, Attorney Haley asked that the Instant Case be marked down for a May 17th status conference, to which the Government concurred, further requesting the time until that status conference be excluded from the Speedy Trial clock.  (See id. at 29-32 (relying upon 18 U.S.C. § 3161(h)(1)(D).)  The May 17th status conference was scheduled and the time until then was excluded "despite the defendant's frustration", to ensure "a reasonable time frame . . . to try the case" and that Petitioner receive "a fair trial and . . . everything he [wa]s entitled to." (Id. at 32:18-21; see also id. at 43.)  The parties agreed to address a rescheduled trial date at the May 17th status conference. (See id. at 41-42.)

The day before the May 17, 2019 status conference, the Government filed a letter with the Court addressing the remaining days on Petitioner's Speedy Trial clock and the re-scheduling of his trial.  (See Govt's May 16, 2019 Ltr., ECF No. 59.)  In said letter, the Government indicated, based upon conversations with Attorney Haley, the earliest the trial could be rescheduled would be June 3, 2019; therefore, the Government advocated for further exclusion from the Speedy Trial clock until June 3rd.  (See id. at 2-3.)  However, because of the unavailability of its attorney the week of June 3rd, which it asserted was another reason for further

15

exclusion of time from the Speedy Trial clock, the Government sought to "schedule the trial for a date between June 10 and July 1, 2019". (Id. at 3.)

Yet, at the May 17, 2019 status conference, Attorney Haley asserted he was not seeking exclusion of time from the Speedy Trial clock to prepare for trial and such time should not be excluded; indeed, he did not have the consent of Petitioner to agree to such an exclusion. (See JS May 17, 2019 Status Conf. Hr'g Tr., Ex. F, ECF No. 192-6, at 4-5.) The Government countered, arguing Petitioner:

> doesn't have a right to go to trial with an ineffective lawyer because if a defendant were able to push a trial with an ineffective lawyer the defendant would have no consequence. If he's acquitted, he's acquitted. It's done. If he goes to trial with an ineffective lawyer it's a redo because the [C]ircuit's going to send it back . . . .

(Id. at 6:2-9.) Ultimately, the Court agreed with the Government; it excluded from Petitioner's Speedy Trial clock the time until jury selection would begin, which was scheduled for June 17, 2019 (and, by consent, to be conducted by the magistrate judge), with the trial to begin on June 24, 2019. (See id. at 11-12.)

IV. The Trial

The trial in the Instant Case ran for five days, commencing on June 24, 2019 and concluding on July 1, 2019; the jury deliberated on July 2, 2019, reaching its verdict the same

16

day, finding Petitioner guilty on Counts One through Five and not guilty on Count Six. (See Min. Entry Nos. 85, 86, 88, 91, 92, and 93; see also id., Jury Verdict, ECF No. 98.) To prove its case, the Government called 18 witnesses and admitted hundreds of individual exhibits into evidence. Relevant to the claims herein, the Government called: Goetz, Attorney Finkel, McPherson, and Magnuson.

A.    The Relevant Witnesses

1.    Goetz

Among other things, Goetz testified he and Petitioner arranged for the Drug sale on the evening of March 19, 2018, when Goetz sent Petitioner a video of the Drugs via Snapchat, which video was saved on Goetz's father's cellphone and shown to the jury. (See Trial Tr. at 96-97, 103.) Goetz also testified about an exchange of text messages and phone calls he had with Petitioner on the morning of March 20, 2018. (See id. at 96, 105-06.) Then, Goetz testified about Petitioner appearing in Goetz's kitchen, demanding Goetz give Petitioner the Drugs, the ensuing physical struggle over the Drugs, and Petitioner's subsequent pulling of a gun, shooting Goetz in the leg, and then fleeing with the Drugs. (See id. at 106-08.)

During his testimony, Goetz authenticated 911 calls in which he told the police dispatcher: two black males had fled the scene in a black four-door vehicle, possibly a Nissan; the person

17

who shot him had braids (a description consistent with Petitioner's appearance); and, the other male had short dark hair. (See Trial Tr. 112-13.) Goetz admitted he originally and falsely told responding officers that Petitioner had been there to purchase jewelry before admitting said transaction was a drug deal. (See id.)

Attorney Haley conducted a thorough cross-examination, questioning Goetz about: his drug use, including having used marijuana just days before March 20, 2018 (see Trial Tr. 136-37); his history of drug sales (see id. at 156); his criminal history, including a federal fraud conviction and violations of supervised release (see id. at 140-44, 193-94); his prior false statements to law enforcement (see id. at 194-95); and, his inconsistent statements to responding officers in the Instant Case (see id. at 181). Additionally, Attorney Haley specifically questioned Goetz about his communication with Petitioner the night before the Robbery; in response, Goetz stated, although sure he and Petitioner had some type of electronic communication, he could not remember the details. (See id. at 157-58, 164-65.) Attorney Haley also cross-examined Goetz about his Snapchat account, successfully objecting when the Government attempted to introduce evidence that Goetz had Petitioner's Snapchat username saved in his cellphone. (See id. at 92-93.)

2.    Attorney Finkel

Attorney Finkel testified regarding Petitioner's purported alibi defense; he stated Petitioner initially claimed to have left his house in Westbury between 8:00 a.m. and 9:00 a.m. and drove to meet McPherson at the Medford Multicare Center in Medford, supposedly, her place of employment. (See Trial Tr. 285-87.) Petitioner conceded to Attorney Finekl to having a series of communications with Goetz on March 20, 2018, but said those communications regarded stolen laptops, not the Drugs. (See id. at 286, 288.)  Petitioner further told Attorney Finkel that, although he began traveling to Goetz's house, once Goetz told Petitioner there were no longer any laptops for sale, Petitioner reversed course, traveling to Freeport, instead; he never stopped at Goetz's house. (See id. at 288-89.)  Attorney Finkel testified to never having obtained any facts from McPherson or anyone else corroborating Petitioner's alibi because, when he contacted Medford Multicare Center, Attorney Finkel learned McPherson had not worked at the Center for several years.[8]  (See id. at 287, 310-11.)

---

[8]    Independent evidence verified McPherson was not a Medford Multicare Center employee in March 2018 and that neither McPherson nor Petitioner has visited said Center on March 20, 2018. (See Trial Tr. 506-09.)

19

### 3.   McPherson

During her testimony, McPherson confirmed she knew Petitioner since childhood and that he sold marijuana. (See Trial Tr. 424, 429-30.)  McPherson testified she was not a Medford Multicare Center employee on March 20, 2018; indeed, she had not worked at said Center since 2017.  (See id. at 424.)  Regarding the day of the Robbery, McPherson testified, inter alia:  via FaceTime, she communicated with Petitioner, with Petitioner informing McPherson that he was going to see "the kid from the halfway house" about the Drugs (Trial Tr. at 430-31); she cautioned Petitioner against said meeting (see id. at 431); later in the day, Petitioner unexpectedly contacted McPherson again, instructing her to get dressed so they could go out to eat (see id. at 435); and, thereafter, Petitioner arrived at McPherson's home in West Babylon with Mauzoul in a dark grey, four-door vehicle (see id. at 435-36).  Continuing, McPherson further stated: at Petitioner's direction, McPherson drove with Mauzoul to Mauzoul's house in Freeport (see id. at 436); and, during the drive to Freeport: (1) Mauzoul told McPherson that Petitioner did not need to shoot Goetz (see id. 436-39), but (2) via FaceTime, Petitioner told McPherson he had no choice but to shoot Goetz because Goetz had purportedly rushed him (see id. 439-40).

According to her testimony, once at Mauzoul's house in Freeport, McPherson and Mauzoul waited approximately 15 minutes

for Petitioner to arrive; when he did, Petitioner was wearing different clothes. (See Trial Tr. 440-41.) McPherson continued, explaining Petitioner then proceeded: to open Mauzoul's rear driver's side door, at which time McPherson observed white bags and detected the smell of marijuana coming from the back of the car; to use a glove to remove a gun from the back seat; and, to then hand said gun to Mauzoul (see id. at 440). McPherson further testified that, thereafter, she and Petitioner went to an IHOP, where Petitioner informed McPherson of his plans to use her as an alibi. (See id. at 441.)

In her testimony, McPherson also told of Petitioner's subsequent efforts to have her present a false alibi on his behalf. For example, McPherson explained: (1) when Petitioner was incarcerated, via contraband cellphones, he contacted McPherson and directed her to generate Google Voice numbers so that they could speak securely about the false alibi (see Trial Tr. 444-46); and (2) she was visited by Petitioner's brother, who reiterated the false alibi (see id. at 456). Additionally, McPherson authenticated text messages from Petitioner's brother, with one stating "[t]ime is of the essence" and another, concerning the grand jury, stating "them people don't need to know the truth" (id. at 457-64).

Continuing, during her direct testimony, McPherson stated that, on several occasions, Petitioner told her, "he didn't

21

mean for it to happen, but it happened" (Trial Tr. 443). She also acknowledged having admitted herself into a psychiatric facility following a years-long abusive relationship with another individual. (See id. at 472-73.)

On cross-examination, Attorney Haley solicited various information from McPherson. For example, he questioned McPherson regarding a prior recorded statement of hers, stating Petitioner was innocent. (See Trial Tr. at 476.) Attorney Haley also explored McPherson's prior romantic relationship with Petitioner, which soured when McPherson learned of Petitioner's unfaithfulness, thereby underscoring McPherson's potential bias against Petitioner. (See id. at 479-80.) Moreover, McPherson acknowledged sending an ominous email to Petitioner, asserting he was about to feel the anguish she had felt, which had been caused by Petitioner's lies. (See id. at 486.)

4. Magnuson

On June 27, 2019, prior to the Government calling Magnuson, its cell-site expert, the parties stipulated into evidence two of the Government's exhibits, to wit, Exhibit GX 26, which was a compilation of the Phone Records,[9] and Exhibit GX 41, the Mauzoul Phone Records (see Trial Tr. 658). Then, in a June

---

[9] For clarity: The Phone Records refers collectively to the October 2018 Phone Records, March 2019 Phone Records, and May 2019 Phone Records.

22

29, 2019 email to Attorney Haley, the Government disclosed a series of summary slides prepared by Magnuson in anticipation of his testimony, i.e., Exhibit GX 51 (hereafter, the "Summary Slides").

On July 1, 2019, after Magnuson was qualified as an expert without objection (see id. at 670), the Government offered the Summary Slides into evidence. In response, Attorney Haley acknowledged having received the Government's Rule 16 discovery, but, as to the Summary Slides, stated:

> [a]pparently, this particular document was provided to me via an e-mail a few days ago. I have not, frankly, with one exception, returned to my office in the last few days. I leave this courtroom. I go return home. I review the file for the next day. So I have no doubt that the Government provided this to me in the last few days.
> The summary is the same. We've received up to this point all of the underlying information. We just haven't received the summary.
> I advise the Court of this fact because I have not had the opportunity to review this with my client for that reason, and the fault lies with me.

(Id. at 683.)  Hence, Attorney Haley requested a 15-minute recess to review the Slide Summary with Petitioner, which recess was granted.  (See id.)  After the requested recess concluded, having reviewed the Summary Slides with Petitioner, Attorney Haley objected to certain headings used therein on the basis they were unduly suggestive.  (See id. at 685, 689-90.)  In response, the Government redacted said objected-to headings.  (See id. at 692.)

23

Thereafter, Magnuson continued with his testimony, using the Summary Slides. (See, e.g., Trial Tr. 695.)

In sum, based upon the cell tower locations that interacted with Petitioner's and Mauzoul's respective cellphones on the day of the Robbery, Magnuson opined Petitioner and Mauzoul traveled together: first, to the vicinity of Goetz's house, where they remained until the time Goetz called 911 to report being shot; and, then, toward McPherson's house, after which they split up. (See Trial Tr. 700-24; see also generally, Ex. GX 51.) After the split-up, the cell tower data showed Petitioner's cellphone returning to the vicinity of his home in Westbury and then onto Freeport, with Mauzoul's cellphone traveling directly to Freeport. (See generally id.; see also generally, Ex. GX 51.) Magnuson's testimony and visual aids broadly corroborated the testimonies of Goetz and McPherson.[10]

However, Attorney Haley proceeded to vigorously challenge the veracity of Magnuson's opinions during cross-examination. For example, Attorney Haley attacked the reliability of Magnuson's opinions as they related to Petitioner's whereabouts at the time of the Robbery. He did so, first, by asking Magnuson to identify an industry publication that would

---

[10]  "Moreover, despite Goetz and McPherson having no relationship or apparent contact, their testimony largely corroborated each other's accounts of March 20's events." Post-Trial Order, 2020 WL 70921, at *4.

support his testimony; Magnuson was unable to do so.  (See Trial Tr. 730.)  Then, Attorney Haley solicited concessions from Magnuson that he had not physically visited any of the cell towers identified in his Summary Slides and did not know the distance from Goetz's house to the nearest cell tower.  (See id. at 732-33, 746.)  In addition, in anticipation of Magnuson's testimony, Attorney Haley had traveled to the cell tower he believed to be the nearest to Goetz's house so as to be prepared to dispute any proffered opinion that Petitioner was physically present at the time Goetz was shot.  (See id. at 689.)  As a result, Attorney Haley presented Magnuson with maps and photographs of cell towers, and using them, was able to solicit from Magnuson the further admission that Petitioner's cellphone could have activated a cell tower near Goetz's house even if Petitioner were physically present at the Medford Multicare Center, as Petitioner claimed in his alibi notice.  (See id. at 733, 739, 746.)

Further, during his cross-examination of Magnuson, Attorney Haley confronted the Government's cell-tower expert with apparent inconsistencies in cell-site data.  First, Attorney Haley pointed out that T-Mobile apparently assigned a street address to the cell tower which carried the 11:01 a.m. phone call to an address different from Goetz's address.  (See Trial Tr. 745-46.)  Second, Attorney Haley highlighted missing cell phone data from display's Magnuson relied upon.  (See id. at 748-49.)  For example,

25

regarding an 11:30 a.m. call between Petitioner and McPherson on March 20, 2018, the following exchange ensued:

[Haley] Q:      Is there some reason why [the length of the call is] not contained on your chart?

[Magnuson] A:   We would have to ask T-Mobile for that specific information.

[Haley] Q:      Well, you created these charts based upon original, or copies of documents provided to you by T-Mobile.  Is that correct?

[Magnuson]A:    Correct . . .

[Haley] Q:      . . . You have no information to offer this court and jury as to the reason that that box that says "Duration" is blank as opposed to all the other boxes that indicate a duration of the call, three minutes, five minutes, seven minutes? You have no explanation as to why that's blank, do you?

[Magnuson] A:   No.

(Id. at 746-49.)

B.    Attorney Haley's Summation

At the close of the Government's case, prior to summations, Attorney Haley moved for a judgment of acquittal, which oral motion was denied.  (See Trial Tr. 755.)  Then, in his closing arguments, Attorney Haley advances Petitioner's alibi argument and attacked the credibility of Goetz and McPherson.  (See id. at 780-98.)

[Remainder of page intentionally left blank.]

26

### 1.   The Alibi Defense

Attorney Haley advanced the contention that the cell-site evidence was not inconsistent with Petitioner's alibi, but was consistent with Petitioner's narrative of events:

> Spencer admits he was heading out that day in the vicinity where Goetz resided. He told you that they went to the Medford Multicare Center. He told you that he began to drive toward 99 Middle Island Boulevard when he had a communication with Goetz and Goetz told him he did not have laptops. So my client, Spencer, turned around, and headed back home. So he did contact Goetz. We don't dispute that.

(Trial Tr. 793.)

### 2.   The Attacks on Credibility

Further, to encourage the jury to discredit McPherson, Attorney Haley highlighted McPherson had been recorded avowing Petitioner was innocent, and she had initially agreed to support Petitioner's alibi. (See Trial Tr. 780-81.) Attorney Haley also underscored McPherson was biased against Petitioner. (See id. at 782-83.)

As for Goetz, emphasizing his criminal history, prior bad acts and false statements, and motivation to lie under an agreement with the Government, Attorney Haley characterized Goetz as a "thief" and "liar". (See Trial Tr. 784-87.) Attorney Haley further asserted others may have been motivated to shoot Goetz. (See id. at 788.) In his efforts to establish reasonable doubt,

27

Attorney Haley highlighted:  Goetz did not identify Petitioner as the shooter when he first called 911 (see id. at 788-89); Goetz and Petitioner did not discuss the Drugs in their morning communications the day of the Robbery (see id. at 789); and, there was no corroborating evidence that Goetz sent Petitioner a Snapchat video the night before the Robbery (see id. at 790-91).

C.    The Verdict

The jury reached its verdict on July 2, 2019; it found Petitioner guilty on Counts One through Five, counts with related to the Robbery and Petitioner's subsequent, related obstruction of justice.  (See Verdict Sheet, ECF No. 98.)  Further, in answering interrogatories raised under Count Two, the jury found Petitioner did not brandish the firearm, but discharged it, during the Robbery.  (See id.)  Petitioner was found not guilty on Count Six, an earlier, unrelated shooting incident.  (See id.)

V.   Post-Trial

After completion of the trial, at a July 18, 2019 status conference, Attorney Haley was replaced by Attorney Ferrante. (See July 18, 2019 Min. Entry, ECF No. 102; CJA Appt. Form, ECF No. 103; see also Jean Decl., ECF No. ECF No. 180-1, at ¶¶ 9, 11.) Thereafter, Attorney Ferrante filed Petitioner's Post-Trial Motion, as well as represented Petitioner at his sentencing and on appeal.  (See, e.g., Post-Trial Mot., ECF No. 110; Def. Sent'g

Memo, ECF No. 140; Notice of Appeal, ECF No. 147; see also Jean Decl., ¶ 11.)

    A.    <u>Petitioner's Post-Trial Rules 29 & 33 Motion</u>

In his Post-Trial Motion, Petitioner moved pursuant to Criminal Rule 29 for acquittal, premised primarily upon the assertions that Goetz was an incredible witness whose testimony contradicted other evidence and McPherson was an unstable person with mental health issues and animosity towards Petitioner thereby rendering her testimony, much of which was not corroborated by other evidence, untrustworthy, and pursuant to Criminal Rule 33 for a new trial, premised primarily upon purported Rule 16 violations and the late provision to the defense of the Summary Slides. (<u>See generally</u> Post-Trial Mot., ECF No. 110.)

In this Court's <u>Post-Trial Order</u>, the undersigned denied Petitioner's Post-Trial Motion in its entirety. As to Petitioner's Rule 29 acquittal portion of the Post-Trial Motion, the Court ruled the time to challenge a witness's credibility is during trial, <u>i.e.</u>, upon cross-examination and during closing arguments. <u>See Post-Trial Order</u>, 2020 WL 70921, at *4. In any event, and notwithstanding certain inconsistencies, a reasonable jury could find Goetz's and McPherson's respective testimonies believable. <u>See</u> <u>id.</u> (stating further, "despite Goetz and McPherson having no relationship or apparent contact, their testimony largely corroborated each other's accounts of March 20's events").) And,

29

"in addition to being able to evaluate any alleged inconsistencies in the [Goest'z and McPherson's] testimony, the jury was aware of issues touching on their credibility." Id. With all of that before it, the jury "made a credibility determination regarding these witnesses' accounts of the charged crimes"; finding no basis to disturb the verdict upon the record presented, Petitioner's request for a judgment of acquittal was rejected. Id.

As to Petitioner's Rule 33 new trial portion of his Post-Trial Motion, based upon the Government's purported late provision of discovery materials related to the use of various cellphones (including disclosure of its expert), the Court rejected said request. See Post-Trial Order, 2020 WL 70921, at *5-7. Instead, given the record, the Court found "well before trial, the Government provided Defendant with: relevant cell site records, Magnuson's resume, the expected basis of Magnuson's testimony, and the information and records that would underlie that testimony." Id. at *6. And, as to the Summary Slides, the Court found:

> The slides, turned over during trial, were a
> summary aid. [Petitioner] objected to some of
> the content; the Government agreed to
> redactions. Despite [Petitioner's] current
> arguments, it is readily apparent to the Court
> that [Petitioner] was well aware of what both
> Magnuson's testimony and any accompanying
> records or slides would show: that his phone's
> location corresponded with the Goetz robbery
> and timeline. As far back as April [2019],
> [Petitioner] proposed an alibi that comported

30

> with the cell site data.  He continued to argue
> that alibi right through closing statements.

Id. at *6.  The Court further observed, even if it were to conclude a technical Rule 16 violation occurred, such violation would not compel a new trial, since, in its discretion, the Court allowed defense counsel the time he requested to review the Summary Slides, as well as "permitted his requested redactions."  Id.  That approach was sufficient to assuage any due process issues and the defense did not object to said approach.  See id. at *7.

B.    Petitioner's Appeal

After he was sentenced and Judgment entered, on October 20, 2021, Petitioner filed a Notice of Appeal.  (See ECF No. 147.) At the appellate level, on Petitioner's behalf, Attorney Ferrante advanced six arguments in support of reversing Petitioner's conviction.  Relevant to the instant Petition, however, were Petitioner's arguments that: (a) this Court erred in admitting Magnuson's testimony and Summary Slides in light of the Government's not having complied with Rule 16; (b) the Government committed prosecutorial misconduct, having elicited false testimony from Goetz and McPherson regarding the events of March 20, 2018; and (c) Attorney Haley was ineffective since he did not: (i) retain a defense expert, (ii) seek a lengthier continuance before cross-examining Magnuson, or (iii) adequately cross-examine other Government witnesses.

31

In its April 13, 2022 summary order, the Appellate Court rejected Petitioner's arguments and confirmed his conviction. See Second Circuit Affirmance, 2022 WL 1100433. More specifically, as to the three relevant arguments (identified supra): (x) as to the admission of Magnuson's testimony, it was not a Rule 16 violation and, even if it were, Petitioner had not demonstrated substantial prejudice from the allegedly untimely disclosure of that testimony, see id. at *1-2; (y) as to purported prosecutorial misconduct, the alleged inaccuracies and inconsistencies with Goetz's and McPherson's respective testimonies were insufficient to establish perjury, a necessary element to maintain Petitioner's prosecutorial misconduct claim, see id. at *2-3; and (z) the Circuit Court declines to consider Petitioner's ineffective-assistance claim because the record on that claim was not sufficiently developed on direct appeal, see id. *3. After en banc review and then Petitioner's petition for a writ of certiorari were denied, the instant Petition timely followed.

## DISCUSSION

I.  Applicable Law

   A.   The Section 2255 Standard Generally

      "The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91 (2011). To obtain relief under Section

32

2255, a petitioner must show "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a); see also United States v. Hoskins, 905 F.3d 97, 102 (2d Cir. 2018).  Therefore, a collateral attack on a conviction or sentence is available "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)); accord Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000); Rodriguez v. United States, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), aff'd, 679 F. App'x 41 (2d Cir. Feb. 15, 2017).

When determining whether to grant relief, Second Circuit precedent "instructs that § 2255 review is 'narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources.'"  Hoskins, 905 F.3d at 102 (quoting Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks omitted)); see also Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) ("Because collateral challenges are in tension with society's strong

33

interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." (internal quotation marks omitted)).  Additionally, in advancing a federal habeas corpus writ, the petitioner has the burden of proving his claims by a preponderance of the evidence.  See Negron v. United States, 520 F. Supp. 3d 296, 301 (E.D.N.Y. 2021) ("A § 2255 movant bears the burden to prove the claims in his § 2255 motion by a preponderance of the evidence." (citing Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000) (further citation omitted)); accord Skaftouros v. United States, 667 F.3d 144, 158 (2d Cir. 2011).

B.    Ineffective-Assistance-of-Counsel Claims

> Claims of ineffective assistance of counsel are evaluated under the framework set forth in Strickland v. Washington, 466 U.S. 668 (1984).  "First, the [petitioner] must show that counsel's performance was deficient."  Strickland, 466 U.S. at 687. "Second, the [petitioner] must show that the deficient performance prejudiced the defense." Id.

Herring v. United States, No. 20-CV-9752, 2025 WL 3124678, at *4 (S.D.N.Y. Nov. 6, 2025); see also Cabral v. United States, No. 12-CR-0336, 2022 WL 307809, at *6 (E.D.N.Y. Feb. 2, 2022) (stating, "to prevail on his ineffective assistance of counsel claim, [petitioner] must '(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of

34

'prevailing professional norms,'' and (2) ''affirmatively prove prejudice' arising from counsel's allegedly deficient representation'" (quoting United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005); further citation omitted)). As to the first, "performance" prong, a petitioner must: (a) "show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms", with the court's review being highly deferential and indulging in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"; and (b) "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." United States v. Peterson, 896 F. Supp. 2d 305, 312 (S.D.N.Y. 2012) (quoting Strickland; internal quotation marks omitted). As to the second, "prejudice" prong, a petitioner "must demonstrate that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quoting Stickland); see also Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) ("Generally, a defendant suffers prejudice if there is a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings."). In that vein, a petitioner is required to show "[t]he likelihood of a different result [was] substantial, not just conceivable." Harrington, 562 U.S. at 111-12 (internal quotation marks omitted). And, "[i]n assessing

35

prejudice, courts 'must consider the totality of the evidence before the judge or jury.'" Berghuis v. Thompkins, 560 U.S. 370, 389 (2010) (quoting Strickland, 466 U.S. at 695).

"Because both parts of the Strickland test must be satisfied for a petitioner to establish ineffective assistance of counsel, failure to satisfy one part of the test frees a district court from assessing whether the petitioner satisfied the other part of the test." Velez v. United States, No. 05-CV-0537, 2006 WL 1952191, at *4 (S.D.N.Y. July 10, 2006) (citing Strickland, 466 U.S. at 699 (instructing a court need not "address both components of the [two-part Strickland] inquiry if the defendant makes an insufficient showing on one")); see also United States v. Derounian, No. 16-CR-0412, 2024 WL 3623522, at *12 (E.D.N.Y. Aug. 1, 2024) ("A court must reject a petitioner's ineffective assistance of counsel claim if it fails to meet either prong." (citing Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013)).

C.    Consideration of Petitioner's *Pro Se* Status

"When a defendant attacking his . . . sentence is proceeding pro se, the court must 'read [the defendant's] submissions broadly so as to determine whether they raise any colorable legal claims.'" United States v. Williams, No. 20-CR-0404, 2025 WL 660213, at *4 (E.D.N.Y. Feb. 28, 2025) (quoting United States v. Parisi, 529 F.3d 134, 139 (2d Cir. 2008); further

citation omitted).  Hence, since Petitioner's submissions were filed pro se, the Court has liberally construed them "'to raise the strongest arguments that they suggest.'"  Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).  Nonetheless, this does not excuse Petitioner "'from comply[ing] with relevant rules of procedural and substantive law.'"  Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (quoting Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981)).  Furthermore, "if it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the [district court] must dismiss the [habeas] motion."  Seabrook v. United States, No. 22-841, 2023 WL 7489961, at *2 (2d Cir. Nov. 13, 2023) (quoting Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009)).

## II.  Application

### A.   The Petition

#### 1.   Petitioner's Position

In seeking to have his sentence vacated, Petitioner raises three claims of ineffective assistance of counsel, to wit: (a) claiming Attorney Haley was ineffective in his pre-trial preparations because, e.g., he did not: (i) engage in an adequate pre-trial investigate, (ii) retain a cell-site expert, (iii) independently obtain evidence or conduct witness interviews, or

37

(iv) retain an expert regarding Snapchat (see Petition at 4) (hereafter, "Ground One" or the "Pre-Trial Prep Claim"); (b) contending Attorney Haley was ineffective during trial for not retaining or calling Dimitrelos as a defense expert (see id. at 5) (hereafter, "Ground Two" or the "Trial Phase Claim"); and, (c) stating he was denied effective assistance during his appeal since Attorney Ferrante purportedly failed to challenge the constitutionality of the "split-verdict" on Count Two of the Second Superseding Indictment and failed to argue the plain error of the Government's expert testifying about matters purportedly outside the scope of disclosure (id. at 12) (hereafter, "Ground Three" or the "Appellate Counsel Claim").[11]  Petitioner also raises a fourth ground for habeas relief, a claim that he was denied due process, asserting prosecutorial misconduct based upon the Government allegedly using the perjured testimony of Goetz and McPherson and allegedly engaging in Brady violations (hereafter, "Ground Four" or the "Prosecutorial Misconduct Claim"; collectively with Grounds One, Two, and Three, "the Claims").  (See id. at 8.)

In addition to a Support Memo (ECF No. 180) and a Reply (ECF No. 197), Petitioner has also submitted a declaration for the

---

[11]    Notably, in his Support Memo, Petitioner states:  "It is undisputed that Ferrante's assistance was miles better than that of Haley."  (Support Memo at 24.)

Court's consideration.  (See Jean Decl., ECF No. 180-1, attached to Support Memo.)  Of relevance, Petitioner generally avers:

a.    he was made aware of the retention of Dimitrelos, Petitioner's purported expert, only after his trial (Jean Decl. ¶5);

b.    telling Attorney Haley he (Petitioner) did not receive either a Snapchat video or phone call from Goetz the night before the Robbery (id. at ¶6);

c.    while reviewing Magnuson's expert report, telling Attorney Haley it was impossible for Petitioner "to be near Goetz's residence on the day of the shooting" (id. at ¶7);

d.    recalling Attorney Haley telling him (Petitioner) "there was no need to put on a defense" and "he would address all of the inconsistencies in testimony during his closing argument" (id. at ¶8);

e.    his relationship with Attorney Haley was "strained from the beginning", offering by way of general examples that Attorney Haley would not: (i) inform Petitioner of court filings he made, (ii) listen to Petitioner's potential defenses, or (iii) "discuss any defense strategy with [Petitioner] whatsoever" (id. at ¶10); and

f.    being "under the impression" that, on appeal, Attorney Ferrante would be raising the following issues: (i) challenging the constitutionality of a split-verdict on Count Two,

39

and (ii) the Government's expert giving testimony about evidence not provided to the defense (see id. at ¶12).

### 2.    The Government's Position

The Government maintains each of Petitioner's Claims "fall[] well short of establishing entitlement to post-conviction relief." (Opp'n at 29.)  As to Petitioner's claims of ineffective assistance of counsel, it generally argues Petitioner's "assertions are conclusory and facially insufficient". (Id.)

More specifically, addressing Petitioner's Pre-Trial Ineffective-Assistance Arguments (see Support Memo at 19-21), the Government contends Claim One is foreclosed by the Mandate Rule since Petitioner's purported "failure-to-investigate claim" against Attorney Haley "is materially indistinguishable" from his argument to the Circuit Court that there was no corroborated evidence Petitioner had communications with Goetz the night before the Robbery, which argument was rejected by the Circuit Court. (See Opp'n at 30-32 (citing Second Circuit Affirmance, 2022 WL 1100433, at *2).)  Further, the Government argues Petitioner fails to explain what further information should have been sought or how such information would have "swayed the jury's verdict" and fails to demonstrate any actual prejudice suffered from Attorney "Haley's allegedly inferior investigation" (id. at 33); therefore, the Strickland test for ineffective assistance of counsel cannot be met.

40

The Government would also have the Court find Petitioner's pre-trial-investigation position meritless since it is an inconsistent position, clashing with his proffered alibi defense, which defense alibi relied upon the cell-site data Petitioner would call into question. (See id. at 35-36, 38.) And, in any event, to the extent Petitioner further complains Attorney Haley was ineffective for not having used Dimitrelos in his investigations, Attorney Haley filed a notice stating he had "retained" Dimitrelos, "not that he would be a testifying witness", which "was a tactical decision meant to preserve optionality at trial". (Id. at 37.) Moreover, Petitioner's reliance upon the undated and unsworn statement from Dimitrelos in support of his position is unavailing. (See id. at 38-40; see also Dimitrelos Stmt., Ex. B, ECF No. 180-2, attached to Support Memo).)

In addressing Petitioner's Trial-Phase Ineffective-Assistance Arguments (see Support Memo at 21-24), focusing upon Attorney Haley's cross-examination of Magnuson, the Government counters that Petitioner has not shown Attorney Haley was ineffective for not having learned of Magnuson's Summary Slides sooner, especially because Attorney "Haley's conduct when the [Summary S]lides were eventually offered at trial was objectively reasonable[;] he asked for a brief continuance to review them with [Petitioner]." (Opp'n at 42.) Moreover, in its Post-Trial Order, "this Court upheld the reasonableness of the [subsequently

41

requested] 15-minute break" because, prior to trial, the Government had provided the defense with the underlying information which formed the basis for the Summary Slides; and, the Second Circuit concurred. (See id. at 42-42.) For this reason, the Government also contends this basis for habeas relief is foreclosed by the Mandate Rule. (See Opp'n at 43 n.23 (citing Second Circuit Affirmance, 2022 WL 1100433, at *2.).) Moreover, the Government underscores that, notwithstanding a recess of 15 minutes, Attorney Haley was successfully able to challenge certain headings contained in the Summary Slides, thereby undercutting any claim of ineffectiveness. (See id. at 43.) Finally, the Government would discount Petitioner's claims that Attorney Haley was ineffective during his closing arguments for not adequately focusing upon the inconsistencies in the Government's case, asserting he did exactly that. (See Opp'n at 44.) Furthermore, Attorney Haley continued to argue Petitioner's alibi through his closing arguments, as well as challenge the Government's evidence, including "that the evidence did not corroborate Goetz's account of sending a video of the [Drugs] to [Petitioner] the night before the shooting". (Id. at 45.)

Continuing, in responding to Petitioner's Appellate-Phase Ineffective-Assistance Arguments (see Support Memo at 24-26), the Government begins by underscoring it is counsel's prerogative to select which of any number of non-frivolous

arguments to advance upon appeal so as to maximize the likelihood of success on appeal. (Opp'n at 46 (citation omitted).) That is exactly what Attorney Ferrante did; among other arguments presented, he challenged the constitutionality of the split-verdict on Count Two and the Government's expert, Magnuson, testifying to matters purportedly outside the evidence. (See id.; see also Support Memo at 24-25.) Hence, "because [Attorney] Ferrante did precisely what [Petitioner] alleges he should have done, [Petitioner] cannot seriously raise a claim of deficient performance." (Id.) Further, since those arguments were advanced and ruled upon by the Second Circuit, the Government claims the Mandate Rule is triggered. (See id. at 46.)

More specifically as to the Count-Two-constitutionality argument, the Government further contends Petitioner's attempt to nuance the argument, i.e., focusing on the use of the conjunctive "and" in its Second Superseding Indictment, is unpersuasive since Petitioner is "wrong on the law and his attorney was not unreasonable for declining to press an incorrect legal position on appeal." (Opp'n (quoting United States v. Schiff, 801 F.2d 108, 114 (2d Cir. 1986) (stating the law is "settled that indictments worded in the conjunctive, charging violations of statutes worded in the disjunctive can be supported by proof of either of the conjoined means of violating the act" (emphasis added))).) As to the supposed testimony-outside-the-evidence argument Petitioner

43

asserts Attorney Ferrante should have advanced, to the extent this argument rests upon claims of a Rule 16 violation, such claims were already made to and rejected by this Court and the Circuit Court; and, in any event, Attorney Ferrante vigorously advanced that challenge upon appeal.  (See id. at 48-49.)  So, once more, there is no basis to fault Attorney Ferrante for not making an argument which he did press with the Circuit Court.  (See id. at 49.)   Alternatively, notwithstanding Petitioner's attempt to recharacterize it in his Petition, since this argument was raised and ruled upon by the Circuit Court, it is precluded here pursuant to the Mandate Rule.  (See id.)

While it generally addressed other claims and arguments raised by Petitioner (see Opp'n at 49-51), the Government does not meaningfully address Petitioner's Ground Four Prosecutorial Misconduct Claim, which Petitioner does not advance in his Support Memo (see generally Support Memo).  Instead, in his Reply, Petitioner asserts the Government's prosecutorial misconduct of, e.g., withholding alleged exculpatory evidence and "presenting incomplete cell-site data as if it were complete", violated his due process rights.  (Reply at 9-10.)

In support of its Opposition, the Government submits a declaration from Petitioner's trial defense counsel, Attorney Haley.  (See Haley Decl.)  Under penalty of perjury, Attorney Haley credibly avers, inter alia:

44

a.   Once appointed as CJA counsel, he "researched the court docket and noted [Petitioner's] filing of a Notice of Alibi . . . followed by a Supplemental Notice of Alibi", which identified McPherson as his alibi witness (id. at ¶4);

b.   After reviewing the case docket, he "contacted [A]ttorney Finkel to obtain his file and discuss the case with him" (id. at ¶10);

c.   After reviewing Finkel's files, "which included the cell-phone tower 'pinging' records referenced" in the Government's June 11, 2019 letter motion in limine (ECF No. 73), he arranged to meet Petitioner (id.);

d.   He learned in a subsequent conversation with Attorney Finkel and Petitioner, that McPherson had previously worked in Medford, New York and "she would testify that [Petitioner] never met with Goetz on March 20, 2018" but that she had traveled with Petitioner "in his car during the period of time Goetz was assaulted at his residence" (id.);

e.   His docket review also revealed: (i) the Government making an April 26, 2019 Rule 16 disclosure of potential expert witnesses it might call at trial, "including expert witness testimony concerning 'cell-site and geo-location data'" (id. at ¶5; see also ECF No. 31), and (ii) Attorney Finkel's April 29, 2019 submission of a proposed order for the previously approved retention of "a certified cyber and cellular forensic expert to

45

assist in preparation for trial" (id.; see also ECF Nos. 36 and 36-1);

f. Because the Government sought reciprocal notice regarding any expert witness Petitioner planned to rely upon at trial, on May 6, 2019, he "filed a Notice of Retention of Expert . . . in order to timely preserve [Petitioner's] right to call such an expert" (id. at ¶6);

g. In responding to the Government's July 11, 2019 letter motion in limine, he concluded the proffered certifications of (T-Mobile's) business records were complaint with Rule 902(11) of the Federal Rules of Evidence (see id. at ¶6; see also ECF No. 74 (in in limine response, stating further, "the records are properly authenticated for admission into evidence"));

h. As to Petitioner's alibi defense, in preparing his cross-examination of Magnuson, inter alia, Attorney Haley "personally visit[ed] and photograph[ed] the cell phone tower located close to Goetz['s] residence" and "within a few miles" of "McPherson's former place of employment" (id. at ¶12);

i. "Because [he] was satisfied that cross-examination would reveal deficiencies in the [Government's] expert witness testimony, coupled with anticipated concessions by the [G]overnment['s] expert witness concerning the potential reach of cell phone transmissions, [Attorney Haley] elected not to

46

ultimately engage the services of a cellular forensic expert or call one as a defense witness" (id.);

j.   Relatedly, by engaging in a "strategy" of "attacking the sufficiency of the [G]overnment's proof through extensive cross-examination of [G]overnment witnesses", Attorney Haley successfully secured "concessions by . . . Magnuson, the [G]overnment's forensic cellular expert" including having Magnuson admit his Summary Slides did not provide "the precise location" of Petitioner's "cell-phone itself as it move[d] from one location to another within the reach of various cell phone tower sectors" (id. at ¶13);

k.   By way of suggesting his cross-examination strategy was effective, explaining that, given the jury was instructed expert witness testimony carries no more weight than the testimony of any other witness and the jury did not convict Petitioner on Count Six of the Second Superseding Indictment, for which Count the Government's proof was "based primarily upon the testimony of its forensic firearms expert", "that the jury did not regard the testimony of Magnuson as 'proof positive' of [Petitioner's] physical presence" at Goetz's residence on March 20, 2018, relying instead "upon other evidence in convicting [Petitioner] on Counts One through Five" (id. at ¶14);

l.   Having no recollection of Petitioner specifically stating "he did not receive a Snapchat video, []or

47

phone call from Goetz the night before the shooting", but recalling Petitioner telling him both "that any and all communications with Goetz concerned the sale of laptop computers" and that Petitioner did not meet with Goetz because, at some point, Goetz told Petitioner the laptop computers were no longer for sale (id. at ¶15);

m.   "Th[e] evidence of the communications between [Petitioner] and Goetz concerning the sale/purchase of laptop computers, rather than the [Drugs] as claimed by Goetz, was presented to the jury through the testimony of [A]ttorney Finkel . . . ."   (Id.); and

n.   He and Petitioner were aware the Government's compilation of Petitioner's cell-phone communications, i.e., Ex. GX 26, "did not reveal a Snapchat video or telephone call between [Petitioner] and Goetz the night before the shooting" as Goetz testified, and telling Petitioner that he (Attorney Haley) intended to address the inconsistencies in Goetz's testimony in his closing arguments (id. at ¶16).

Of significance, Attorney Haley disavows Petitioner's claim that he (Attorney Haley) "did not listen to potential defenses offered by [Petitioner] or did not discuss defense strategy with him".   (Id. at ¶11.)   Instead, Attorney Haley declares he "listened intently to [Petitioner] who repeated his alibi defense and asserted that the cell phone tower tracking data,

48

which was previously reviewed by him, was consistent with his roadway travel with McPherson . . . on March 20, 2018." (Id.) Finally, Attorney Haley states the defense strategy was "formulated by [Petitioner] who insisted that Finkel file and serve a Notice of Alibi identifying McPherson as his alibi witness who was otherwise unknown to the [G]overnment at the time." (Id. at ¶19 (stating further, Petitioner, "not his counsel, determined the course and direction of his defense which ultimately resulted in his conviction").) As such, Petitioner's unsuccessful defense was not due to ineffectiveness on Attorney Haley's part, "but the result of an alibi defense rejected by the jury." (Id.)

At bottom, the Government takes the position the Petition should be denied in its entirety. (See Opp'n at 52.) For the reasons explained herein, the Court agrees.

B.   The Court's Ruling

1.   No Evidentiary Hearing Will Be Held

"[T]he filing of a motion pursuant to Section 2255 does not automatically entitle the movant to a hearing; that statutory provision does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" Gonzalez, 722 F.3d at 130 (quoting Machibroda v. United States, 368 U.S. 487, 495 . . . (1962)). A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." Id. at 131.

49

Sainfil v. United States, No. 16-CR-0652, -- F. Supp.3d --, 2026 WL 1481079, at *23 (E.D.N.Y. May 27, 2026).

Here, in its discretion, the Court has determined a full-blown evidentiary hearing on the Petition is not necessary in this instance; upon the expanded record presented—where both Petitioner and Attorney Haley have filed affidavits--the Court need not hold an evidentiary hearing.  See, e.g., Kapelioujnyi v. United States, 779 F. Supp.2d 250, 253 (E.D.N.Y. 2009) (ruling an evidentiary hearing was not necessary "where both parties have filed affidavits and thus the testimony of petitioner and his trial counsel would add little or nothing to the written submissions" (citation modified), aff'd, 422 F. App'x 25 (2d Cir. 2011); see also Campusano v. United States, 442 F.3d 770, 776 (2d Cir. 2006) (instructing a district court "has discretion to determine if a testimonial hearing will be conducted"); Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (same).  Nor, as Petitioner contends, are there "substantial unresolved factual disputes" which "cannot be resolved by affidavits alone."  (Reply at 10-11.) Cf., e.g., Perevoznikov v. United States, No. 20-CR-0415, 2025 WL 916883, at *4 (E.D.N.Y. Mar. 25, 2025) ("To warrant a hearing, 'the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief.'" (quoting Gonzalez, 722 F.3d at 131)).  Rather, "the parties'

50

written submissions and the record in this case are more than sufficient and uncontroverted to resolve the conclusory factual issues raised by Petitioner without a hearing and fully supports a denial of the Petition." Sinclair v. United States, No. 2026 WL 607856, at *11 (S.D.N.Y., 2026) (collecting cases denying hearings on Section 2255 petitions); see also Puglisi, 586 F.3d at 214 (instructing, where the judge who tried the underlying criminal case also presides over the Section 2255 motion, "a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner"); Seabrook, 2023 WL 7489961, at *2 (affirming dismissal of habeas petition without hearing where petition was without merit). Accordingly, given its review of the Petition and the record, this Court proceeds to rule upon the Petition without an evidentiary hearing.

   2.   Non-Consideration of the Dimitrelos Statement

      The Court declines to consider the undated, unsworn Dimitrelos Statement proffered by Petitioner in support of his Petition; it is not competent evidence capable of supporting Petitioner's Claims. See, e.g., Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007) (explaining, by way of example, that an unsworn witness recantation "does not constitute 'evidence' within the meaning of 28 U.S.C. § 2244(b)(2)(B), much less 'clear and convincing' evidence", but instead "would need to be in sworn

51

affidavit form, subject to penalty for perjury", since "without the possibility of a penalty of perjury" the purported recanter has "nothing to lose" (emphasis in original)); United States v. Sinde, No. 21-CR-0343, 2026 WL 1674160, at *7-8 (N.D.N.Y. June 10, 2026) (denying habeas petition supported, in part, by unsworn letter of trial witness; stating unsworn nature of letter was sufficient basis to reject it); see also generally Prudential Ins. Co. v. Payne, No. 20-CV-3683, 2024 WL 707299, *3 n.4 (E.D.N.Y. Feb. 20, 2024) (discussing requirement of an affidavit and stating a notarized document without a jurat will not be considered an affidavit in the context of a summary judgment motion).  Indeed, the Second Circuit has stated, "the requirement of an affidavit [is not] a difficult hurdle to clear." Haouaari, 510 F.3d at 354.

Relatedly, and as is instructive here, the Circuit Court has explained:

> Section 1746 provides that an unsworn matter may be treated as sworn, provided that it is "prove[n] by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the . . . form" of the model declaration provided.  28 U.S.C. § 1746 (emphasis added).
>
> Parsing the declaration provided in the statute reveals its substantive elements: the declarant must (1) "declare (or certify, verify, or state)," (2) "under penalty of perjury," (3) that the matter sworn to is "true and correct." Id. . . . . Inclusion of the language "under penalty of perjury" is an integral requirement of the statute for the

52

very reason that it impresses upon the declarant the specific punishment to which he or she is subjected for certifying to false statements. Moreover, . . . omission of the phrase "under penalty of perjury" would "allow[ ] the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods." Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir.1988). We hold that 28 U.S.C. § 1746 requires that a certification of the truth of a matter be expressly made under penalty of perjury. Any other result would be contrary to the plain language of the statute and the objective sought to be advanced by it.

In re World Trade Ctr. Disaster Site Litig., 722 F.3d 483, 488 (2d 2013) (footnote omitted). Following the Circuit Court's guidance, because the Dimitrelos Statement was not made specifically under penalty of perjury, the Court finds it lacks the requisite assurances of reliability and veracity warranting its consideration in support of Petitioner's Petition. Contra Batista v. United States, No. 14-CV-0895, 2016 WL 4575784, at *4 (E.D.N.Y. Aug. 31, 2016) (in context of Section 2255 habeas petition, denying petitioner's motion to strike defense counsel's affidavit where defense counsel stated his affidavit was made "under penalty of perjury" evincing counsel's "acknowledgment that the statement was truthful").

Moreover, as for the Dimitrelos Statement being undated, the Court agrees with the Government's observation that the Statement "appears to have been prepared after the conclusion of [Petitioner's] trial." (Opp'n at 39 (citing Dimitrelos Stmt. at

53

7 (reflecting communications with Attorney Ferrante, who was not appointed until after trial).)  As the Government persuasively argues:  "This fact, in and of itself, casts serious doubt on the document's utility in the context of a habeas proceeding, where a trial attorney's decisions 'must be assessed in light of the information known at the time of the decisions, not in hindsight.'" (Id. (quoting Strickland, 466 U.S. at 680, and citing Gluzman v. United States, 124 F. Supp. 2d 171, 173 (S.D.N.Y. 2000) (decrying ineffective assistance arguments advanced by those "emboldened by the clarity of hindsight" to "second guess various difficult strategic and tactical" decisions by trial counsel)).)  The Court agrees.

Equally troubling is that the Dimitrelos Statement is based upon an incomplete review of the evidence, which, as astutely asserted by the Government, makes "it difficult to take seriously [Dimitrelos'] claimed ability to exonerate" Petitioner.  (Id.) True.  Petitioner himself acknowledged the Dimitrelos Statement failed to account for the supplemental phone records T-Mobile turned over and which were provided to Petitioner before trial, a fact the Circuit Court clarified on appeal.[12]  (See Petitioner at

---

[12]   In the context of rejecting Petitioner's "arguments that the underlying cell-site data should have been excluded because the phone records were missing cell-site data and the records that contained the missing data were not turned over", the Appellate Court stated:

5 (stating "Dimitrelos was never provided with the necessary case documents in order to complete a full review of cell site date")); see also Second Circuit Affirmance, 2022 WL 1100433, at *2 n.1. Hence, admittedly, Dimitrelos' analysis is faulty since it is premised upon incomplete data.  This is a further reason for declining to consider the Dimitrelos Statement as competent evidence supporting Petitioner's Claims for habeas relief.

### 3.   Petitioner's Ineffective-Assistance Claims

Petitioner separates his ineffective-assistance claims into three categorizes: the pre-trial phase; the trial phase; and, the appellate phase.  (See generally Petition; see also Support Memo.)  The Court examines each phase, in turn.

### a.   The Pre-Trial Prep Claim

Recently, in rejecting a habeas petitioner's claim his attorney was ineffective for failing to investigate and prepare for trial, Honorable Nusrat J. Choudhury of this District stated:

The government turned over three sets of phone records.  Although the second set of phone records were missing the cell-site data for certain phone calls, including at least one call between [Petitioner] and Goetz, the first set of phone records the government turned over a few months before trial included the missing data.  And contrary to [Petitioner's] argument, the third set of phone records, which also contained the cell-site data missing from the second set, were disclosed by the government two weeks before trial.

Second Circuit Affirmance, 2022 WL 1100433, at *2 n.1.

> It is true that counsel has a constitutional "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691 . . . . However, "[t]o successfully assert an ineffective assistance of counsel claim based on a failure to investigate, 'a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation.'" United States v. Peterson, 896 F. Supp. 2d 305, 316 (S.D.N.Y. 2012) (internal citation omitted); see also Dollison v. Nassau [County], No. 17-cv-2804, 2019 WL 3531522, at *9 (E.D.N.Y. Aug. 2, 2019) (requiring that a petitioner provide "sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced"). Moreover, "[t]ime and again, courts in the Second Circuit have held that where . . . a habeas petitioner fails to allege, let alone establish, how the result of his case would have been different had any of his laundry list of shortcomings been corrected, there is no basis for finding that . . . any prejudice resulted from [the attorney's] actions." Hernandez v. Artus, No. 09-cv-05694, 2020 WL 2769404, at *11 (E.D.N.Y. May 28, 2020).

Sainfil, 2026 WL 1481079, at *20.[13]

Here, Petitioner's Pre-Trial Prep Claim is based upon Attorney Haley's alleged "failure to follow up with the forensic expert that Finkel secured" (Support Memo at 19-20), to wit, Dimitrelos, and failure to subpoena Petitioner's "Snapchat usage

---

[13]    Focusing upon the prejudice prong of Strickland, finding petitioner failed to show any of counsel's alleged deficiencies in trial preparation caused petitioner prejudice, Judge Choudhury also found defense counsel was not ineffective. See id. at *20, *22.

56

information to determine that he never received the video that Goetz was alleged to have sent." (Id. at 21.)  Neither contention is availing.

### i.    Lack-of-Forensic-Expert Claim

Relying upon the Dimitrelos Statement, Petitioner advances his position that Attorney Haley was ineffective for failing to "follow up with the forensic expert that Finkel secured" (Support Memo at 19), and which failure resulted in evidence that supposedly would have proven Petitioner's innocence not being presented to the jury (see id. at 20).  (See also Reply at 5-6.) First, for the reasons articulated supra, Petitioner's reliance upon the Dimitrelos Statement is misplaced; said Statement is faulty since it relied upon incomplete information.  (See supra at 54-55.)  Relatedly, Petitioner's assertion that Dimitrelos's testimony would have proven Petitioner's innocence is speculative, at best.  Indeed, as this Court found in its Post-Trial Order and the Appellate Court affirmed in its Second Circuit Affirmance, there was other sufficient evidence establishing Petitioner's guilt of the Robbery, e.g., the testimonies of Goetz and McPherson. See Post-Trial Order, 2020 WL 70921, at *4; Second Circuit Affirmance, 2022 WL 1100433, at *3.  Moreover, the record shows that through other investigations and preparation by Attorney Haley, in his cross-examination of Magnuson, Attorney Haley was successful in having Magnuson admit his data could not precisely

pin-point Petitioner's location at the time of the Robbery. (See supra at 25-26; see also Haley Decl. ¶¶11-13.) Such advocacy and Magnuson's resulting concession demonstrates Attorney Haley's assistance fell well within the broad range of constitutionally compliant representation, thereby undermining Petitioner's claim that Attorney Haley was ineffective.

Second, as the Government highlights, "neither Finkel nor Haley ever indicated that they planned to call a cell-site expert at trial." (Opp'n at 36; see also id. at 37 (stating again, "neither Finkel nor Haley ever indicated that Dimitrelos or any other expert would testify for the defense at trial").) In conformity therewith, Attorney Haley credibly averred, his expert disclosure was a tactical decision undertaken "to timely preserve [Petitioner's] right to call such an expert should such testimony be deemed necessary". (Haley Decl. ¶6.) Petitioner's general averments to the contrary do nothing to disavow Attorney Haley's assertion of a strategic choice. (See Jean Decl. ¶5 (generally declaring Attorney Haley never informed Petitioner about retaining Dimitrelos[14]); see id. at ¶7 (Petitioner "recall[ing]" telling Attorney Haley, "while reviewing the expert report prepared by the

---

[14] The Court also notes the veracity of this declaration is highly suspect given the record shows Petitioner was present in Court when Attorney Haley stated he had filed his "expert witness notice" and "[t]he expert ha[d] been retained by Mr. Finkel." (May 7, 2019 Hr'g Tr. at 36.)

United State's witness, that it was impossible for [him] to be near Goetz's residence on the day of the shooting").) Said averments certainly do not rebut the deferential presumption that Attorney Haley's strategic choice of preserving the right to call an expert was constitutionally compliant, reasonable representation. See, e.g., Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (holding a court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices" (quoting Strickland, 466 U.S. at 690)); see also McBride v. Coveny, No. 19-CV-0200, 2020 WL 4194895, at *8 (S.D.N.Y. July 21, 2020) ("Whether counsel should have taken certain investigatory steps and presented particular evidence are strategic decisions for which substantial deference is given."). Additionally, under the fact scenario of this case, the Court is hard-pressed to find this prophylactic measure taken by Attorney Haley prejudiced Petitioner. Cf., e.g., United States v. Valerio, No. 14-CR-0094, 2024 WL 2084052, at *18 (E.D.N.Y. May 9, 2024) (finding petitioner "ha[d] not demonstrated a 'reasonable probability' that hiring a private investigator . . . would have exculpated or helped his case to the point of causing a different result"; concluding the Strickland prejudice prong was not satisfied); see also, e.g., Alston v. United States, No. 15-CR-0435, 2021 WL 2380064, at *7 (S.D.N.Y. June 10, 2021)

59

(finding an "effective defense does not necessarily require the services of a private investigator" because the investigator may "[come] up with nothing useful").

Moreover, the Government succinctly articulates why Petitioner's Lack-of-Forensic-Expert Claim is unavailing:

> Put plainly, given that [Petitioner]'s alibi defense adopted the cell-site data, and that [Attorney] Haley conducted a careful and comprehensive cross-examination of the government's expert, there is simply no factual or legal basis for [Petitioner]'s contention that [Attorney] Haley was ineffective for not calling a rebuttal expert.

(Opp'n at 38 (citing Haley Decl. ¶¶ 11-12 (explaining Haley "elected not to ultimately" utilize Dimitrelos based upon Petitioner's insistence the cell-site data was "consistent with" his alibi defense and, to the extent it was not, Haley "was satisfied that cross-examination would reveal deficiencies in [Magnuson's] testimony")). The Court concurs. See, e.g., Swaby v. New York, 613 F. App'x 48, 50 (2d Cir. 2015) ("[T]he failure to seek an expert does not satisfy the performance prong of Strickland where counsel chooses a strategy that does not require an expert."). Indeed, as here, "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." Rios v. Bradt, No. 13-CV-4442, 2020 WL 5709158, at *14 (E.D.N.Y. Sept. 24, 2020) (quoting Harrington, 562 U.S. at 111); see also Hamilton v. Lee, 94 F. Supp. 3d 460, 479

60

(E.D.N.Y. 2015) (finding challenging prosecution's expert on cross-examination was a strategic choice and fell within the broad range of reasonable representation); Solano v. Keyser, No. 19-CV-3569, 2022 WL 22889880, *14 (S.D.N.Y. Sept. 29, 2022) (stating a trial attorney's tactical decision whether to call a specific witness falls squarely within the ambit of trial strategy which, if reasonably made, is not grounds for an ineffective assistance claim, "whether wise in retrospect or not" (quoting Baran v. United States, 160 F. Supp. 3d 591, 598 (S.D.N.Y. 2016); further citations and quotation marks omitted).  At bottom, via his Lack-of-Forensic-Expert Claim, Petitioner has failed to establish Attorney Haley's assistance was offensive to the Sixth Amendment.

ii.  No-Petitioner-Snapchat-Information Claim

Petitioner also maintains Attorney Haley was ineffective for not engaging in further investigation regarding the Snapchat video Goetz stated he sent to Petitioner the night before the Robbery. (See Support Memo at 20-21.)  According to Petitioner, to be effective, Attorney Haley "could have subpoenaed [Petitioner's] Snapchat usage information to determine that he never received the video that Goetz was alleged to have sent." (Id. at 21 (emphasis added); see also id. n.14.)  Petitioner also believes, since Attorney Haley did not take that step, "the Jury heard about and watched a video that Goetz said he sent to

61

[Petitioner] and all they heard in rebuttal was that there was no record of the video being sent." (Id.) This Claim is without merit.

First, in this instance, there was no need for Attorney Haley to subpoena Petitioner's Snapchat usage information since the Government had already obtained that information via a warrant directing the production of same for Goetz and Petitioner; importantly, that information was provided "to the defense well before trial." (Opp'n at 32; see also, e.g., Gov't Apr. 17, 2019 Cover Ltr., ECF No. 21 (identifying "[r]cords obtained from Snapchat Inc. pursuant to a search warrant" as Rupe 16 supplemental disclosure materials being provided to defense); Snapchat Warrant, Ex. A, ECF No. 192-1 (sealed), attached to Opp'n.) Under this scenario, it is unclear what more precise information a further investigation of Petitioner's Snapchat usage would have produced. See, e.g., Dollison v. Nassau County, No. 17-CV-2804, 2019 WL 3531522, at *9 (E.D.N.Y. Aug. 2, 2019) (requiring petitioner provide "sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced"). In any event, what was produced was enough for Attorney Haley to question Goetz's credibility and the Government's case. (See Trial Tr. at 791 (raising the rhetorical question, in summation, "where is the proof that corroborates [Goetz's] statement that this video was sent to [Petitioner]").)

62

Given the record presented and the strong presumption Attorney Haley's representation fell within the wide range of reasonableness, Petitioner is unable to show otherwise. And, Petitioner has not demonstrated a "reasonable probability" that the Snapchat records he claims Attorney Haley could have secured would have assisted his case to the point of causing a different result. See, e.g., Valerio, 2024 WL 2084052, at *20 (finding, on the Strickland prejudice prong, petitioner could not show counsel was ineffective for not obtaining certain records petitioner asserts he asked counsel to secure); accord United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) (in the context of addressing a challenge as to the sufficiency of evidence, stating "[a] jury may convict on circumstantial evidence alone" (citation omitted)).

Second, as discussed supra, given the other evidence of Petitioner's guilt, even assuming Attorney Haley did not thoroughly investigate Petitioner's Snapchat communications with Goetz—or lack thereof—Petitioner cannot demonstrate prejudice. See Valerio, 2024 WL 2084052, at *20 (finding, where there was overwhelming evidence of petitioner's guilt at trial, even assuming trial counsel failed to investigate certain records, petitioner could not show a substantial likelihood of a different result; therefore, the Strickland prejudice prong could not be established). As the Second Circuit observed, in addition to the

63

video, Goetz testified both that he and Petitioner "discussed the drug deal leading up to the shooting" and that Petitioner stole the Drugs.  Second Circuit Affirmance, 2022 WL 1100433, at *3.  And, "McPherson testified that she saw [Petitioner] remove a white bag of marijuana from a car [Petitioner] was driving shortly after the shooting."  Id.  In other words, there was ample evidence—independent of the hypothetical Snapchat evidence Petitioner now claims—supporting the jury's verdict; as a result, Petitioner is unable to show he was prejudiced by Attorney Haley's representation.  See, e.g., Garner v. Lee, 908 F.3d 845, 862 (2d Cir. 2018) ("Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." (quoting Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001); quotation modified).  As such, the Court rejects Petitioner's No-Petitioner-Snapchat-Information Claim as grounds for granting habeas relief.

b.   The Trial Phase Claim

In his Petition, Petitioner bases his Trial Phase Claim on the contention Attorney Haley "failed to present a meaningful defense", anchoring said Claim on Attorney Haley's "fail[ure] to consult with Dimitrelos."  (Petition at 5.)  Petitioner relies upon the Dimitrelos Statement in support of the Claim.  (See id. (quoting Dimitrelos Stmt.).)  As discussed, Petitioner's reliance upon said Statement to establish Attorney Haley failed to present

64

a meaningful defense is misplaced.  (See supra, DISCUSSION, Part II.B.2.)

Further, Petitioner's argument supporting this Claim, which comprises predominantly of reasons why Goetz should not have been found credible, is a non-starter.  (See Support Memo at 22.) Those reasons have already been raised and rejected by this Court and by the Appellate Court.  See Post-Trial Order, 2020 WL 70921, at *4; Second Circuit Affirmance, 2022 WL 1100433, at *2-3.  Thus, notwithstanding Petitioner's attempt to reframe this position as an ineffective-assistance claim, consideration of this argument is foreclosed by the Mandate Rule.  See Yick Man Mui, 614 F.3d at 53 ("The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate"), and 57 (holding "strategies, actions, or inactions of counsel that gave rise to an ineffective assistance claim adjudicated on the merits on direct appeal may not be the basis for another ineffective assistance claim in a Section 2255 proceeding").  In any event, as discussed, the record shows Attorney Haley vigorously challenged Goetz's veracity (see supra at 18-19); in doing so, his representation fell squarely within the constitutionally acceptable range of reasonableness.  The fact the jury ultimately rendered a verdict unfavorable to Petitioner

65

does not convert to unconstitutional Attorney Haley's reasonable professional assistance.

To the extent Petitioner also complains Attorney Haley was ineffective for not properly preparing to challenge the Government's expert, Magnuson (see Support Memo at 23), that contention, too, is unpersuasive. Once more, the Circuit Court has ruled on this issue, albeit in the context of a claimed Rule 16 violation, stating Petitioner "cannot demonstrate substantial prejudice from the allegedly untimely disclosure of Magnuson's testimony." Second Circuit Affirmance, 2022 WL 1100433, at *2. Hence, the Mandate Rule bars its reconsideration here. Even if that were not the case, Petitioner's present position is belied by the record. As astutely articulated by the Government, which articulation the Court adopts:

> insofar as Magnuson's testimony was inconsistent with [Petitioner's] alibi, Haley effectively cross-examined him. And in doing so, Haley revealed himself to be exceptionally well-prepared, having personally traveled to the cell tower he believed was nearest to the crime scene and bringing to court previously prepared printouts of maps and photographs to elicit testimony supporting [Petitioner's] alibi. Haley had also clearly familiarized himself with the records and data underlying Magnuson's opinions, successfully pointing out that T-Mobile had apparently assigned a street address to the cell tower that carried the crucial 11:01 a.m. phone call which was different from Goetz's address.

(Opp'n at 42.)    Additionally, Attorney Haley specifically questioned Magnuson about missing data in the T-Mobile records, eliciting from Magnuson that he had "no explanation as to why" certain fields in T-Mobile spreadsheets were "blank".  (See Trial Tr. 746-49.)  Under these circumstances, Attorney Haley was not ineffective for not calling Dimitrelos to testify.  See Englert v. Lowerre, 115 F.4th 69, 82 (2d Cir. 2024) (instructing, while defense attorneys have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," courts "evaluate the reasonableness of an attorney's investigative choices with a 'heavy measure of deference to counsel's judgments'" (citations omitted)); Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury.  The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess." (internal citations and quotation marks omitted)); United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (instructing a "counsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation" (internal quotation marks and citations omitted)).  At bottom, during the

67

trial phase, Attorney Haley acted as counsel guaranteed by the Constitution.  Thus, Petitioner's Trial-Phase Claim fails.

### c.    The Appellate Counsel Claim

Petitioner's challenge to the effectiveness of Attorney Ferrante's assistance is two-fold: first, Attorney Ferrante should have challenged the constitutionality of the split-verdict as to Count Two (hereafter, the "Count-Two-Related Challenge") (see Support Memo at 25); and, second, regarding the alleged Rule 16 violation, Attorney Ferrante should have further argued the Government's expert relied upon evidence not disclosed to the defense, to wit, "the T-Mobile records [it] obtained in May [2019] or the records from the Mouzuol [sic] phone" (hereafter, the "Rule-16-Related Challenge").    (Id.)    Both challenges are unavailing.

### i.    The Count-Two-Related Challenge

As a preliminary matter, this challenge is precluded by the Mandate Rule.  Upon appeal, Attorney Ferrante challenged the purported inconsistency of the jury's verdict as to Count Two, arguing "the jury's special interrogatory answers finding that he discharged but did not brandish the firearm was repugnant because in order to discharge a firearm, one must first brandish it." Second Circuit Affirmance, 2022 WL 1100433, at *3; see also United States v. Jean, No. 20-3659, Def.'s Br. (Doc. No. 66) (hereafter, the "Jean Appellate Brief"), at 65-67 (2d Cir. Oct. 5, 2021).  The

68

Circuit Court held Petitioner was "incorrect" since "[b]randishing requires the intent to 'intimidate,' while discharging does not include an intent requirement." Id. (citations omitted).

In any event, Attorney Ferrante is afforded a strong presumption that his performance was adequate. See Strickland, 466 U.S. at 689. Relatedly, as appellate counsel, he has broad professional discretion to select from among any number of non-frivolous arguments "to maximize the likelihood of success on appeal". Smith v. Robbins, 528 U.S. 259, 288 (2000); see also generally Jones v. Barnes, 463 U.S. 745, 754 (1983). "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo, 13 F.3d at 533 (instructing further, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome").

Upon the record presented, Petitioner has not overcome the presumption afforded Attorney Ferrante; instead, the Court finds Attorney Ferrante was not ineffective in presenting the Count-Two-Related Challenge. As Petitioner requested, Attorney Ferrante argued Count Two "required a showing of both brandishing and discharging a firearm." (Jean Decl. ¶12); cf. Jean Appellate Brief at 66 (arguing defense's position "that brandishing and discharging of a firearm are both necessary elements to the

69

completed offense since one cannot happen without the other" and "[t]here is no view of the case that can resolve that inconsistency" (emphasis added)).  Attorney Ferrante's presentation of the Count-Two-Related Challenge to the Circuit Court fell well-within his professional judgment, as well as clearly aligned with Petitioner's declared understanding of the argument Attorney Ferrante represented he would present to the Appellate Court.  (See Jean Decl. at ¶12.)  Petitioner's current dissatisfaction with the nuance of Ferrante's presentation falls well-short of demonstrating Attorney Ferrante ignored issues which were clearly stronger than those presented.  Cf., e.g., Mayzick v. United States, No. 16-CR-0429, 2026 WL 879520, at *19 (E.D.N.Y. Mar. 31, 2026) (finding petitioner failed to show counsel ineffective where said counsel made the very arguments petitioner complained were not made).  Stated differently, Petitioner has wholly failed to show that, if Attorney Ferrante had presented the Count-Two-Related Challenge in the manner Petitioner now advocates (see Support Memo at 25 (arguing the Government was bound by its use of the conjunctive "and" in Count Two of the Second Superseding Indictment)), "there is a reasonable probability that the outcome of the proceeding would have been different".  Mayo, 13 F.3d at 534.  Additionally, as the Government highlights:  "[T]he law is 'settled that indictments worded in the conjunctive, charging violations of statutes worded in the disjunctive, can be supported

70

by proof of <u>either</u> of the conjoined means of violating the act.'" (Opp'n at 27 (quoting <u>United States v. Schiff</u>, 801 F.2d 108, 114 (2d Cir. 1986); emphasis in Opp'n).)  Thus, given the absence of the requisite "reasonable probability" showing, Petitioner's Count-Two-Based Challenge fails to make out his Appellate Counsel Claim.

### ii.  The Rule-16-Related Challenge

For substantially the same reasons Petitioner's Count-Two-Based Challenge fails, so, too, does his Rule-16-Related Challenge.  To begin, this challenge is barred by the Mandate Rule since Attorney Ferrante did raise it upon appeal, and the Circuit Court ruled upon it, rejecting it.  <u>Compare</u> Jean Appellate Brief at 15-23, <u>with</u> <u>Second Circuit Affirmance</u>, 2022 1100433, at*1-2, and n.1; <u>see, e.g.,</u> <u>United States v. Pitcher</u>, 559 F.3d 120, 123 (2d Cir. 2009) ("It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal." (internal quotation marks and citations omitted)).  Even if that were not the case, Attorney Ferrante did present the argument Petitioner declared he "was under the impression" Attorney Ferrate would raise on appeal, <u>to wit</u>: "the expert called by the United States provided testimony about evidence not provided to the defense."  (Jean Decl. at ¶12); <u>compare</u> Jean Appellate Brief at 15-23.  At bottom, Petitioner's speculation that "had Ferrante asserted the rest of the Rule 16

71

argument", i.e, "the T-Mobile records [the Govenrment] obtained in May or the records from the Mouzoul [sic] phone", "the outcome of [Petitioner's] appeal would have been different" (Support Memo at 26), underscores his disagreement with Attorney Ferrante's strategic choice in how to present that argument to the Appellate Court; it does not show Attorney Ferrante "omitted [a] significant and obvious issue[] while pursuing issues that were clearly and significantly weaker", McKee, 167 F.3d at 106, or the "reasonable probability" that had Attorney Ferrante presented the Rule-16-Related Challenge in the manner Petitioner now advocates, the outcome of the appeal would have been different.  Hence, on this basis, Petitioner fails to show Attorney Ferrante was ineffective in his assistance; as such, Petitioner's Rule-16-Related Challenge does not warrant the requested habeas relief.

####    4.    Petitioner's Non-Ineffective-Assistance Claim: The Prosecutorial Misconduct Claim

Petitioner's final Ground for habeas relief is the Government's alleged prosecutorial misconduct.  (See Petition at 8.)   However, Petitioner fails to advance this Ground in his Support Memo.  (See Support Memo, in toto.)  Instead, for the first time, in his Reply, Petitioner addresses this Ground.  (See Reply at 9-10.)  "Generally, courts do not consider arguments raised for the first time in a reply brief, and this rule applies in the

context of habeas petitions." Derounian, 2024 WL 3623522, at *16 (citing Tardif v. City of N.Y., 991 F.3d 394, 404 n.7 (2d Cir. 2021) ("[I]ssues raised for the first time in a reply brief are generally deemed waived.")) (collecting cases); Gabbidon v. Lee, No. 18-CV-2248, 2022 WL 1557272, at *7 n.9 (S.D.N.Y. Mar. 10, 2022) (noting "a habeas petitioner cannot raise a federal claim for the first time on reply" and explaining "by raising an argument solely in a reply brief, the petitioner deprives the respondent of an opportunity to respond to the new claim"). Thus, the Court deems waived Petitioner's Prosecutorial Misconduct Claim.

In any event, given the Circuit Court already addressed and rejected Petitioner's Prosecutorial Misconduct Claim in its Second Circuit Affirmance, see 2022 WL 1100433, at *2-3, the Mandate Rule would bar this Court's reconsideration of said Prosecutorial Misconduct Claim. See Derounian, 2024 WL 3623522, at *11 (stating Mandate Rule "bars the raising in a habeas proceeding of a claim when the events underlying the claim were the same as those underlying a claim raised and decided on the merits on direct appeal" (citation omitted)); see also Linick v. United States, No. 13-CR-0120, 2022 WL 17065998, at *3 (E.D.N.Y. Nov. 16, 2022) ("The mandate rule bars re-litigation of matters expressly decided by the appellate court . . . and issues impliedly resolved by the appellate court's mandate." (quoting Rodriguez v. United States, 767 F. App'x 160, 164 (2d Cir. 2019) (citation

73

modified)).  As a result, this Ground does not warrant granting habeas relief.

–*–*–*–

To the extent not explicitly stated herein, the Court has considered Petitioner's remaining arguments and finds them to be without merit.  At bottom, given the record of this case, and having considered the relevant case law, the Court finds Petitioner is unable to satisfy the applicable Stickland test or is otherwise unable to establish entitlement to habeas relief.

CONCLUSION

Accordingly, for the foregoing reasons, **IT IS HEREBY ORDERED** that Petitioner's Petition seeking to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF No. 178) is **DENIED** in its entirety;

**IT IS FURTHER ORDERED,** because there can be no debate among reasonable jurists that Petitioner is not entitled to relief, the Court does not issue a Certificate of Appealability.  See 28 U.S.C. § 2253(c); see also Middleton v. Att'ys Gen., 396 F.3d 207, 209 (2d Cir. 2005); Baker v. United States, No. 97-CR-0877, 2022 WL 2803556, at *2 (E.D.N.Y. July 18, 2022) ("On the whole, Petitioner has not made a substantial showing of the denial of his constitutional rights, and the [court's decision] thus does not warrant a Certificate of Appealability."); and

74

**IT IS FURTHER ORDERED,** the Clerk of the Court is directed to mail a copy of this Memorandum and Order to Petitioner at his address of record, including the notation "LEGAL MAIL" on the mailing envelope, and mark as "CLOSED" the corresponding civil case, Case No. 23-CV-9174.

**SO ORDERED.**
/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   July 7, 2026
         Central Islip, New York

75